No. 63,543

EDWARD D. ROBBINS, JR., individually and as Trustee of the Edward D. Robbins Trust, EDWARD GALLUP, FRED GALLUP, and MARGARET GALLUP GARDNER, *Appellees,* v. CHEVRON U.S.A., INC., *Appellant,* v. KANSAS GAS SUPPLY CORPORATION, *Third-Party Defendant/Intervenor.*

(785 P.2d 1010)

Opinion filed January 19, 1990.

*Malcolm Miller*, of Wichita, argued the cause, and *John P. Woolf* and *Timothy E. McKee*, of Triplett, Woolf & Garretson, of Wichita, were with him on the briefs for appellees.

*Joseph W. Kennedy*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause, and *Robert W. Coykendall* and *Gerald N. Capps*, of the same firm, were with him on the briefs for appellant.

*Lawrence M. Berkowitz*, of Stinson, Mag & Fizzell, of Kansas City, Missouri, argued the cause, and *John J. Miller*, of the same firm, *Mark D. Hinderks*, of the same firm, of Overland Park, and *Michael K. Johnston*, of Hampton, Hampton, Johnston & Eisenhauer, of Pratt, were with him on the brief for third-party defendant/intervenor.

*Spencer L. Depew* and *David W. Nickel*, of Depew Gillen & Rathbun, of Wichita, were on the brief *amicus curiae* for Kansas Independent Oil and Gas Association.

The opinion of the court was delivered by

MCFARLAND, J.: In this action plaintiff lessors contend defendant lessee breached an implied covenant to market gas. The district court entered summary judgment in favor of the plaintiffs cancelling the oil and gas leases involved and ordering an accounting. Twelve wells are involved. Defendant appeals therefrom.

Plaintiffs own the mineral interests in approximately 5,900 acres of land situated in Kiowa and Comanche counties. In 1956 and 1957, Gulf Oil Corporation, defendant's predecessor in interest, obtained oil and gas leases from plaintiffs. Subsequently, substantial quantities of gas were found. The leases represent the greater part of what is known as the Glick Field.

In June 1960, Gulf entered into a 20-year gas purchase contract with Kansas Gas Supply Corporation (KGS). Under this contract, KGS agreed to "take or pay" for an amount of gas that would: (1) exhaust the reserves over the life of the contract; or (2) be at least 80% of each well's ability to deliver gas. KGS owns a Kansas intrastate natural gas pipeline that originates in the Glick Field and terminates in the Wichita area. The primary utilization

of gas so transported was to provide boiler fuel for Wichita power plants owned by Kansas Gas & Electric Company (KGE).

In 1978 Gulf and KGS entered into an amended contract which extended the term from June 1980 to December 31, 1990. In return for the extension, KGS agreed to increase the price of the gas purchased under the contract to either 45¢ or 55¢ per Mcf, depending upon whether or not compression was applied, until December 3, 1980; to $1.50 per Mcf from December 4, 1980, to December 3, 1981; to $1.55 per Mcf from December 4, 1981, to December 3, 1982; and for the remainder of the contract the price would be redetermined annually based on the average of the highest price paid by any three pipeline buyers within an eight-county area. There were no changes to the contractual taking requirements. At the time of this amendment, the price for gas under the existing contract was 20.5¢ per Mcf.

On April 17, 1978, the date of the contract amendment, Gulf imposed the following express condition on the amended contract:

"Gulf's execution of this amendment is expressly conditioned upon receiving the stated price increases as set forth. If the Kansas Corporation Commission refuses to approve any of the price increases and/or redetermined prices as of the dates provided by this amendment, then the gas purchase contract dated June 24, 1960, as amended, will terminate the date of said refusal and the term extension provided by this amendment will not be applicable."

Gulf received the price of gas in accordance with the terms of the amendment and paid royalties based on these prices in the years 1978 through 1982.

Beginning on December 4, 1982, the determined price for the gas was to be $3.27 per mmbtu. However, the price under the contract was set at $2.289 per mmbtu by the Kansas Natural Gas Price Protection Act (Act), K.S.A. 55-1401 *et seq.* Gulf and KGS agreed that the contract price was capped by the Act. Gulf sold gas at the $2.289 per mmbtu price through December 1984, when the Act expired.

In 1984, a dispute arose between Gulf and KGS. Demand for the gas had been sharply reduced, prices were down, and KGS was under pressure from the Kansas Corporation Commission to reduce its costs by renegotiating contracts containing "favored nations" clauses such as the one herein. KGS successfully re-

negotiated contracts with some Glick Field producers. It did not reach agreement with Gulf.

From January 1, 1985, until September 13, 1985, Gulf continued to sell gas to KGS. According to Gulf, the contract price, upon redetermination, was approximately $3.56 per mmbtu. KGS paid, however, $2.28 per mmbtu for the gas.

On September 13, 1985, by which time Gulf had merged with Chevron USA, Inc., (Chevron) the wells were shut in. The wells remained shut in until approximately October 1, 1987. During the shut-in period, Chevron timely tendered shut-in royalty payments. Other producers in the Glick Field continued to produce and sell gas from this common source of supply.

In February 1987, Chevron filed suit against KGS in the United States District Court for the District of Kansas, *Chevron U.S.A., Inc. v. Kansas Gas Supply Corp., et al. v. Kansas Gas and Electric Co.*, No. 87-1115-C, for alleged breach of contract. That lawsuit is being vigorously pursued by all parties.

In October 1987, Chevron began selling gas from the wells herein at approximately $1.21 per Mcf to Oxy Marketing, Inc., a KGS affiliate.

On July 28, 1988, plaintiffs filed this lawsuit to cancel the gas leases, alleging that in 1978 Chevron breached its implied obligation to market their gas by extending the gas purchase contract through 1990 and by the lack of sales between September 1985 and September 1987. On September 1, 1988, Chevron filed its answer and third-party complaint against KGS, seeking indemnity for any losses it might incur as a result of this action. Concurrent with its answer, Chevron filed a motion to dismiss, contending in part that Chevron, as a matter of law, did not breach its implied marketing obligation and that cancellation was not a remedy available to the plaintiffs. The motion was denied.

On October 14, 1988, plaintiffs filed a motion for partial summary judgment seeking a determination that Chevron's leases should be cancelled for breach of the implied covenant to market. On November 2, 1988, Chevron responded to plaintiffs' motion for partial summary judgment and filed a cross-motion for partial summary judgment, again contending that no implied duty to market the gas had been violated.

Following a hearing on the motions, the district court, on December 16, 1988, granted plaintiffs' motion for partial summary judgment, ruling that Chevron had breached its implied duty to market the gas and that cancellation of the leases effective as of the date the wells were shut in (September 13, 1985) was the appropriate remedy. The district court further ordered an accounting for all production after October 1, 1987, at a price of not less than $2.45 per Mcf. The journal entry was filed December 20, 1988.

On January 5, 1989, Chevron filed a motion for certification of the December 20, 1988, journal entry as a final judgment under K.S.A. 1988 Supp. 60-254(b) and staying enforcement of such judgment under K.S.A. 60-262(g).

On February 28, 1989, a hearing was held on the accounting and the district court, on March 9, 1989, entered judgment against Chevron in the amount of $4,419,064.57. In the same journal entry, the district court entered an order certifying its December 20, 1988, order and its action on the accounting as a final judgment pursuant to K.S.A. 1988 Supp. 60-254(b).

It should, perhaps, be noted by way of explanation that the portion of the action between plaintiffs and Chevron, unresolved by the partial summary judgment, concerns quieting title to one well and was held to require an evidentiary hearing as to whether or not commercial quantities of gas have been produced therefrom since July 1983. By certifying under K.S.A. 1988 Supp. 60-254(b), the district court effectively severed this claim from the balance of the action, thereby directing entry of final judgment on those claims resolved by the summary judgment and permitting immediate appeal thereof. Chevron duly appealed from the summary judgment and judgment upon accounting.

Chevron's claims of error fall into three categories as follows:

1. *Entry of summary judgment.* Chevron contends the district court based its finding and conclusion upon controverted facts and ignored certain uncontroverted facts. Further, the trial court erroneously concluded Chevron had breached an implied covenant to market the gas.

2. *Relief afforded.* Chevron contends the cancellation of the leases was an inappropriate remedy. Chevron further con-

tends the award of damages was computed on improper bases.

3. *Denial of summary judgment to Chevron.* Chevron contends that, as a matter of law, it was entitled to summary judgment in its favor.

## SUMMARY JUDGMENT

Summary judgment is proper if no genuine issue of fact remains, giving the benefit of all inferences which may be drawn from the admitted facts to the party against whom judgment is sought. *Bockhaus v. City of Halstead,* 242 Kan. 504, 506, 748 P.2d 870 (1988). In *Bacon v. Mercy Hosp. of Ft. Scott,* 243 Kan. 303, 306-07, 756 P.2d 416 (1988), we discussed the movant's burden and our scope of appellate review, as follows:

"The burden on the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. On appeal we apply the same rule, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. *Lessley v. Hardage,* 240 Kan. 72, 73-74, 727 P.2d 440 (1986). The party opposing summary judgment, however, has the affirmative duty to come forward with facts to support its claim, although it is not required to prove its case. *Willard v. City of Kansas City,* 235 Kan. 655, Syl. ¶ 2, 681 P.2d 1067 (1984); *Mays v. Ciba-Geigy Corp.,* 233 Kan. 38, Syl. ¶ 5, 661 P.2d 348 (1983). If factual issues do exist, they must be material to the case to preclude summary judgment. *Busch v. City of Augusta,* 9 Kan. App. 2d 119, 123, 674 P.2d 1054 (1983)."

In entering the summary judgment herein, the district court concluded, in part, as follows:

"2. The duty to market the hydrocarbons once discovered is a responsibility placed upon the lessee for practical and equitable reasons. No good purpose would be served by enlarging on that statement. Suffice it to say that the lessee has a superior bargaining power and control over the marketing of hydrocarbons as between the lessor and the lessee and the marketing obligation acts to prevent the lessee from speculating at the expense of lessor whose benefits will only come about when the gas is marketed. It would follow then as it has been said that

'The lessee is to be held accountable for the production of the lease as a prudent operator working for the common advantage of both the lessor and the lessee.'

"3. The wells in question were shut-in from September 13, 1985 until October 1, 1987 and notwithstanding the proffer on the part of the lessee to pay shut-in royalty payments of $1.00 per acre, they are not excused

from their duty to diligently search for a market and otherwise conduct themselves as a reasonable and prudent lessee under the same or similar circumstances. The defendant did not reasonably and prudently market the gas in place any time after April of 1978 and thus, as a matter of law, has failed in its implied duties.

"4. Extension of the contract (1978) with its conditions was imprudent. Looming on the scene was the Wolf Creek project in which KG&E had announced its participation, KG&E consuming almost 80 to 85% of all gas purchased by Kansas Gas and Supply. Without KG&E to purchase its gas, KGS as a pipeline could neither take nor pay for the plaintiff's gas. Thus the execution of the amendment to the contract in 1978 was inadequate and imprudent.

"5. Additionally the contract became vitiated by the absence and failure of Chevron to receive the price increases which were written into the contract by the 1978 amendment. At this point, certainly Chevron was left free to market the plaintiff's gas. Probably this date could be reasonably set at January 1, 1985, the date that Kansas Price Protection Act expired."

We have long held that there is an implied obligation to market oil and gas under a lease agreement. Once oil or gas is discovered in paying quantities, the lessee has an implied obligation to produce and market production diligently. *Howerton v. Gas Co.*, 81 Kan. 553, 106 Pac. 47, *rev'd on other grounds* 82 Kan. 367, 108 Pac. 813 (1910). The Kansas Legislature as a matter of public policy has by statute included the implied covenant to explore and develop all oil and gas leases when such covenants are not contained in the lease. K.S.A. 55-223.

In *Adolph v. Stearns*, 235 Kan. 622, 626, 684 P.2d 372 (1984), we discussed the rule by which a lessee's performance is measured:

"Whether a lessee has performed his duties under the expressed or implied covenants is a question of fact. In absence of a controlling stipulation, neither the lessor nor the lessee is the sole arbiter of the extent, or the diligence with which, the operations and development shall proceed. The standard by which both are bound is what an experienced operator of ordinary prudence would do under the same or similar circumstances, having due regard for the interests of both. [Citation omitted.]"

It is not the place of courts, or lessors, to examine in hindsight the business decisions of a gas producer. One learned treatise on the subject, 5 Williams & Meyers, Oil and Gas Law § 856.3 (1989), states:

"The greatest possible leeway should be indulged the lessee in his decisions about marketing gas, assuming no conflict of interest between lessor and

lessee. Ordinarily, the interests of the lessor and lessee will coincide; the lessee will have everything to gain and nothing to lose by selling the product." p. 411.

The treatise cautions against second-guessing an operator's marketing decision:

"There is great risk that close judicial supervision of the lessee's conduct in selling gas will inhibit his exercise of his best judgment to the detriment of both landowner and operator. Scrutiny of lessee's actions by judges (or, worse, juries) in the light of *after-acquired* knowledge will tend to encourage the operator to take the least hazardous and perhaps least profitable course of action. It is unnecessary to impose this conservatism on the operator when his interest in selling the gas is fully identified with that of his landowner." pp. 412-13. (Emphasis supplied.)

In *Christiansen v. Virginia Drilling Co.*, 170 Kan. 355, 361, 226 P.2d 263 (1951), this court stated that a lessor who alleges breach of an implied covenant to develop has the burden of showing by substantial evidence that the covenant has been breached (following *Fischer v. Magnolia Petroleum Co.*, 156 Kan. 367, 133 P.2d 95 [1943]).

Included in the statement of uncontroverted facts Chevron filed with its response to the summary judgment motion were the following:

"1. In April 1978 or prior thereto, the other producers in the Kansas Gas System entered into contract amendments on essentially the same terms as the agreement between Gulf and KGS. These producers include Blaik Oil Company, Petroleum, Inc., Beren Corporation, S & G Oil Company, Inc., Petro Corp., Pickrell Drilling, Barbara Oil Co. and others.

. . . .

"2. KGS' entering into the amendments extending the contract was approved by the Kansas Corporation Commission.

. . . .

"3. In December 1982 Gulf and KGS agreed that the contract price would be capped by the Kansas Natural Gas Price Protection Act.

. . . .

"4. In negotiations and contracts subsequent to September 1985, KGS and Chevron have recognized the continuing validity of the contract. KGS expressly has retained the right to take gas pursuant to that contract.

. . . .

"5. The contract terms contained in the contract between Chevron and KGS as amended in 1978 are very favorable to the producer and the royalty owner since they required a high level of takes at a high price.

. . . .

"6. There was no alternate market for the gas in September 1985."

Each of these factual allegations was followed by references to portions of the record supporting same. These have been omitted herein. None of these statements were controverted by plaintiffs.

Looking at the factual situation and inferences which may be reasonably drawn therefrom, the following appears. There is nothing in the 1978 contract amendments that is patently imprudent. Prior to the amendments, the price being paid was 20.5¢ per Mcf. Pursuant to the amendments the price increased dramatically. Also, KGS was committed to a high take or pay arrangement and a most favored nation clause for determining future price. The contract amendments occurred when gas was in short supply and prices were rising. Other producers in the Glick Field entered into similar contracts.

There was also uncontroverted evidence that both KGS and KGE expected, in 1978, that demand for the gas for use by KGE would remain high through the 1980's notwithstanding development of the nuclear power plant at Wolf Creek. Plaintiffs accepted the increased royalties arising from the 1978 amendments without complaint.

Chevron refused to accept KGS' attempts to reduce the price in 1984-85 and stood on the terms of the contract, which had several more years to run. At least some producers in the Glick Field did accept the renegotiated lower prices. The situation reached an impasse and the wells were shut in, with shut-in royalties being tendered. There was apparently no alternate market for the gas in September 1985, when the wells were shut in. Chevron ultimately filed the federal suit against KGS which is pending and involves breach of contract claims.

In determining whether Chevron acted imprudently in entering into the 1978 amendments, in refusing to renegotiate for lower prices in 1984-85, in shutting in the wells in 1985, in seeking alternative markets thereafter, and in the other complained-of acts, Chevron's conduct must be judged upon what an experienced operator of reasonable prudence would have done under the facts existing at the time. The wisdom of hindsight cannot be utilized in making such determinations. The individuals claiming imprudence have the burden of proving same. Whereas the events underlying this action are mainly undisputed, the claim

that Chevron acted imprudently in any of the claimed particulars is hotly contested, and such claim, by its very nature, must be supported by expert testimony.

We have no hesitancy in concluding that the entry of summary judgment in favor of plaintiffs was improper under the circumstances herein and must be reversed.

## RELIEF AFFORDED

Inasmuch as relief may ultimately be granted to the plaintiffs on remand, some discussion of two of the issues raised relative thereto is appropriate although the relief granted by the trial court herein is reversed by the reversal of the summary judgment.

As a general rule, forfeiture of oil and gas leases for breach of an implied covenant is disfavored. *Christiansen v. Virginia Drilling Co.*, 170 Kan. at 361; *Alford v. Dennis*, 102 Kan. 403, 406, 170 Pac. 1005 (1918). Forfeiture should be granted only if a remedy of damages is inadequate. *Howerton v. Gas Co.*, 81 Kan. at 561.

In *Howerton v. Gas Co.*, 81 Kan. 553, this court held that cancellation was an appropriate remedy for a lessee's breach of an implied covenant to market. 81 Kan. at 563-65. However, upon rehearing, we reversed because the lessors plaintiffs failed to show that damages would not afford an adequate remedy. *Howerton v. Gas Co.*, 82 Kan. at 368-69. We said:

"Penalties and forfeitures are not favorites of the law, and if in this case the damages which the plaintiffs sustain from the breach of the contract can be ascertained with reasonable certainty no forfeiture can be adjudged." 82 Kan. at 370.

Forfeiture is an extreme remedy and should only be granted where damages cannot be determined with reasonable certainty. On the present record we cannot determine whether or not the requisites for declaring a forfeiture could exist herein if plaintiffs ultimately prevail. We mention this aspect of the issues only to draw attention to the law relative to forfeiture, should the issue again arise.

One other matter relative to the court-ordered lease cancellation needs to be discussed. In its memorandum opinion the district court concluded:

"7. The only remedy available to the plaintiffs at this time is cancellation of the leases because of the breach of the implied contract to market as

well as the fact that the leases expired by their terms for failure on the part of the lessee to produce gas."

The district court ordered cancellation for breach of the implied covenant to market the gas *and* for failure to produce gas during the period the wells were shut in.

Paragraph 4 of the oil and gas lease herein states, in pertinent part, as follows:

"The lessee shall pay lessor as royalty ⅛ of the proceeds from the sale of gas as such at the mouth of the well where gas only is found and where such gas is not sold or used, lessee shall pay or tender annually at the end of each yearly period during which such gas is not sold or used, as royalty, an amount equal to the delay rental provided in paragraph 5 hereof, and while said royalty is so paid or tendered this lease shall be held as a producing lease under paragraph 2 hereof."

In compliance with the terms of this provision, Chevron tendered shut-in royalty payments to plaintiffs during the shut-in period, September 1985 to October 1987. The payments were not accepted.

In *Pray v. Premier Petroleum, Inc.*, 233 Kan. 351, Syl. ¶¶ 2-3, 662 P.2d 255 (1983), we held:

"A shut-in royalty clause in an oil and gas lease enables the lessee, under appropriate circumstances, to keep a nonproducing lease in force by the payment of shut-in royalties. Such a clause by agreement of the parties creates constructive production."

"The fact a lease is held by payment of shut-in royalties does not excuse the lessee from his duty to diligently search for a market and reasonably develop the leasehold."

Standing alone, the fact the wells were shut in during the two-year period would not warrant cancellation, as the contractual shut-in royalty payments were tendered. To justify cancellation, plaintiffs would have to establish that there was a concurrent breach of the implied covenant to market and that damages flowing therefrom could not be determined with reasonable certainty, all as previously discussed.

We see no benefit to be derived from any discussion of other claims of error relative to the relief granted. The summary judgment has been reversed, and, in the event plaintiffs ultimately prevail upon remand, the particular relief granted at that time and the full record may be so different from what is before us

now that any further discussion of what was done previously would be of little value to the parties.

## DENIAL OF SUMMARY JUDGMENT TO CHEVRON

Chevron contends that plaintiffs have failed to present a prima facie case to support their claim that Chevron acted imprudently in marketing the gas and thereby breached its implied covenant. Plaintiffs claim that Chevron acted imprudently by various acts extending over a considerable period of time. Each of these claims must be considered individually. Through pretrial proceedings and possible further summary judgment motions, each of these claims should be tested. There may or may not be any claims left after this winnowing process. At this point, however, we decline to hold that the district court's denial of summary judgment to Chevron was improper.

The judgment is reversed and the case is remanded for further proceedings.