No. 68,344

Mary C. Tucker, *et al., Appellants/Cross-Appellees,* v. Hugoton
Energy Corp., *et al., Appellees/Cross-Appellants.*

(855 P.2d 929)

Opinion filed July 9, 1993.

*Gregory J. Stucky*, of Fleeson, Gooing, Coulson & Kitch, of Wichita, argued the cause, and *David G. Seely*, of the same firm, was with him on the briefs for appellants/cross-appellees.

*Timothy E. McKee*, of Triplett, Woolf & Garretson, of Wichita, argued the cause, and *Robert J. Knapp*, of the same firm, and *Jim H. Goering*, of Foulston & Siefkin, of Wichita, were with him on the brief for appellees/cross-appellants.

The opinion of the court was delivered by

LOCKETT, J.: This appeal arises from eight consolidated lawsuits tried to the court in which plaintiffs/appellants claimed certain of defendants' oil and gas leases had automatically terminated because the leaseholds had failed to produce gas in commercial quantities. The trial court ruled in favor of the plaintiffs in two cases and against them in six cases. Plaintiffs in those six cases appeal, claiming the trial court: (1) failed to make sufficient findings of fact to conclude the wells were producing or capable of producing gas in paying quantities; (2) erred in finding the shut-in royalty payments perpetuated the leases; and (3) erred in considering the suit as an equitable action for lease forfeiture rather than a legal action to terminate the leases. Defendants cross-appeal, claiming the trial court erred by not entering judgment in their favor on grounds the plaintiffs were estopped from claiming the leases terminated.

Plaintiffs-lessors are (1) certain landowners of the lands covered by the defendants' oil and gas leases involved in these lawsuits and (2) Plains Resources, Inc. (Plains). Defendants-lessees are (1)

Hugoton Energy Corporation (Hugoton), (2) Plains Petroleum Operating Company (PPOC), (3) Hamilton Brothers Oil and Gas Corporation, (4) Texaco, Inc., (5) Mesa Mid-Continent Limited Partnership, and (6) Mesa Operating Limited Partnership. Defendant Hugoton is the successor operator to PPOC. The other defendant-lessees owned smaller working interests in the gas units but did not operate the units.

The wells involved in this lawsuit are in the Bradshaw Field in Hamilton County, Kansas. They were initially drilled in the 1960's by Kansas-Nebraska Natural Gas Company, Inc., now KN Energy, Inc. (KN Energy). The primary term of the various oil and gas leases expired long ago. Each of the wells has produced gas only and each produced gas nearly every month until the mid-1980's. KN Energy initially operated the wells and owned a substantial interest in the associated leasehold estates. It also owned the gathering and pipeline system which transported the gas produced from those wells.

Gas from these wells is of relatively low quality. The wells have relatively low deliverability, and they produce significant amounts of water. Because the wells produce large quantities of water, they cannot be turned on and off to meet current demands. They, therefore, require a high level of maintenance.

In 1983, KN Energy formed Plains Petroleum Company, a wholly owned subsidiary. KN Energy transferred its gas units in the Bradshaw Field to this new corporation and then entered into a Gas Purchase Contract for all the gas produced from the units.

As the price of gas increased, KN's sale of gas drastically decreased because of a decline in industrial gas sales. KN lost substantial sales, for instance, when a major commercial customer, a gas-fired energy plant, switched to coal. As a result of the decline in gas sales, KN's purchases of natural gas under the gas purchase contract also declined.

On September 13, 1985, Plains Petroleum Company became independent of KN Energy. Plains Petroleum Company then formed a wholly owned subsidiary, Plains Petroleum Operating Company, on December 1, 1986, and transferred its Bradshaw Field interests and the KN Energy gas purchase contract to PPOC.

In 1986, the wells involved in this appeal encountered mechanical problems and production from the wells ceased. PPOC elected not to repair and produce those wells because of the high cost of maintenance. The wells remained off production for more than three years, each subsequently resuming production at a different time. During those periods in which the wells were not producing, PPOC tendered "shut-in" royalty payments which were accepted by the lessors.

In 1989, PPOC decided to sell its properties in the Bradshaw Field. It prepared and distributed a Sales Brochure which contained information regarding its Bradshaw Field properties, including revenue and operating expense information for the wells for the 28-month period from January 1987 through April 1989. The brochure indicated that operating expenses exceeded revenues for each of the wells during that period.

In the summer of 1989, Plains Resources determined that the leases at issue had terminated because the wells were not producing in paying quantities or were not capable of producing in paying quantities. Consequently, Plains acquired new oil and gas leases covering the properties associated with the wells. In November 1989, Hugoton became the successor in interest to the original lessees when it acquired PPOC's leases covering those same properties.

Plaintiffs brought this action to terminate Hugoton's oil and gas leases.

### TRIAL COURT DECISION

After reviewing the evidence, the trial court found that all the leases involved in the lawsuit had valid shut-in royalty payment provisions; when the six wells involved in this appeal were first shut down in 1986 it was for mechanical reasons; and PPOC subsequently chose to invoke the shut-in royalty payment provisions of the leases rather than to repair the wells because PPOC would not be able to recover its costs of repair at the price being paid by and the limited market available through KN Energy.

As relevant to this appeal, the trial court concluded that when the wells were shut down and shut-in royalty payments made, there was no market available for the sale of the natural gas that could be produced from the wells. The court also concluded that

prior to and after the shut-in period, four of the wells were producing in paying quantities and were capable of producing in paying quantities when shut in and that, as to two of the wells, repairs had commenced within the time frame required by the leases but that a sufficient period of time had not passed to determine whether the revenue from the sale of gas would exceed the Lease Operating Expense (LOE).

The trial court refused to terminate defendants' leases in those six cases.

As noted previously, plaintiffs in those six cases appeal, and defendants cross-appeal. Because the record does not support plaintiffs' conclusion that the trial court considered this to be an equitable action for lease forfeiture rather than a legal action to terminate the leases, we do not address plaintiffs' third claim of error.

## INSUFFICIENT FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs first claim the trial court's findings of fact and conclusions of law were insufficient to support its determination that the wells were producing or capable of producing gas in paying quantities. Plaintiffs, however, did not raise this issue with the trial court.

Where the trial court has made findings of fact and conclusions of law, the function of an appellate court is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. Stated in another way, "substantial evidence" is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. *Williams Telecommunications Co. v. Gragg*, 242 Kan. 675, 676, 750 P.2d 398 (1988).

In reviewing the decision of a trial court, this court must accept as true the evidence and all inferences to be drawn therefrom to support the findings of the trial court, and must disregard any conflicting evidence or other inferences that might be drawn

therefrom. *State v. McKeown*, 249 Kan. 506, 515, 819 P.2d 644 (1991). Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. K.S.A. 60-252(a).

Supreme Court Rule 165 (1992 Kan. Ct. R. Annot. 134) provides that in all contested matters submitted to a judge without a jury the judge shall state the controlling facts required by K.S.A. 60-252 and the legal principles controlling the decision. This requirement is in part for the benefit of the appellate courts in facilitating review. Where the trial court's findings of fact and conclusions of law are inadequate to disclose the controlling facts or the basis of the court's findings, meaningful appellate review is precluded.

It is well established, however, that a litigant must object to inadequate findings of fact and conclusions of law in order to give the trial court an opportunity to correct them. In the absence of an objection, omissions in findings will not be considered on appeal. Where there has been no such objection, the trial court is presumed to have found all facts necessary to support the judgment. *Celco, Inc. of America v. Davis Van Lines, Inc.*, 226 Kan. 366, 369, 598 P.2d 188 (1979).

A review of the record shows the trial judge failed to set out the mathematical procedure he used to arrive at the income and expenses for each of the wells. However, because plaintiffs failed to object to the inadequacy of the findings and thereby allow the trial judge the opportunity to further explain his findings and conclusions, the trial judge's omission is not reversible error.

### SHUT-IN ROYALTY PAYMENTS

Plaintiffs next contend the trial court erred in concluding the shut-in royalty payments perpetuated the leases because (1) the trial court erred in finding that no market existed for the gas, and (2) the wells were not mechanically capable of producing gas.

There were three different shut-in royalty clauses and related repair clauses involved in this case. All were similar to the following:

"Where gas from a well or wells, capable of producing gas only, is not sold or used for a period of one year, lessee shall pay or tender, as royalty,

an amount equal to the delay rental as provided in paragraph (5) hereof, payable annually at the end of each year during which such gas is not sold or used, and while said royalty is so paid or tendered this lease shall be held as a producing property under paragraph numbered two hereof."

"If, upon, or after the expiration of the primary term of this lease, the well or wells on the leased premises, or on the consolidated gas leasehold estate, shall be incapable of producing, this lease shall not terminate provided lessee resumes operations for drilling a well on the leased premises or on the consolidated leasehold estate within one hundred twenty (120) days from such cessation, and this lease shall remain in force during the prosecution of such operations and, if production results therefrom, then as long as production continues."

Plaintiffs first argue that shut-in royalty clauses cannot be invoked when there is a market for the gas or the wells are not capable of producing because of mechanical problems. Although the trial court concluded that at the time the wells were shut down and the shut-in royalty payments made there was no market for the gas that could be produced from the wells, plaintiffs contend that conclusion is inconsistent with the trial court's factual findings. They point out the court's factual finding that, as to each of the six wells, PPOC invoked the shut-in royalty payment provisions because it would not be able to recover its costs of repair at the price being paid by *and the limited market available* through KN Energy. They argue the finding that there was a *limited* market is inconsistent with the conclusion that there was *no* market and, since there was a limited market, shut-in royalty clauses could not be invoked.

As a general rule, forfeiture of oil and gas leases for breach of an implied covenant is disfavored. Whether a lessee has performed its duties under expressed or implied covenants is a question of fact. In the absence of a controlling stipulation, neither the lessor nor the lessee is the sole arbiter of the extent, or the diligence with which, the operations and development shall proceed. The standard by which both are bound is what an experienced operator of ordinary prudence would do under the same or similar circumstances, having due regard for the interests of both. In making such a determination, consideration is given only to the circumstances existing at the time without benefit of the wisdom of hindsight.

In *Pray v. Premier Petroleum, Inc.*, 233 Kan. 351, 352, 662 P.2d 255 (1983), the lessor executed an oil and gas lease which contained the standard provision with a primary term of two years " 'and as long thereafter as oil and gas, or either of them, is produced from said land by the lessee, or the premises are being developed or operated.' " The lease also contained a shut-in royalty clause. During the primary term of the lease, the lessee began drilling operations on the property. A well capable of producing gas in paying quantities was completed.

In *Pray*, the lessee's effort to market the gas was fruitless since it was the only gas well in the area and was three miles from a gas line. The lessee tendered payment under the shut-in royalty provision. For five years, the shut-in royalty payments were paid and accepted. Thereafter, the lessors refused to accept them. Lessors then filed a quiet title action claiming the gas well was not capable of producing in paying quantities because the cost of connecting the pipeline rendered it unprofitable. The trial court concluded that the cost of transporting the gas to the nearest market should be used in determining whether the well was capable of producing in paying quantities and determined the lease had expired by its own terms.

On appeal, the sole issue was whether the costs of connection could be used in determining the well's capability of producing in paying quantities. We determined costs of connecting the pipeline should not be included and that to do so would essentially negate the effectiveness of a shut-in royalty clause. 233 Kan. at 356.

In reversing the trial court, the *Pray* court discussed some of the typical provisions of an oil and gas lease. It noted that, generally, under the habendum clause of an oil and gas lease, oil or gas must be produced in "paying" or commercial quantities in order to perpetuate a lease beyond its primary term. Paying quantities is synonymous with commercial quantities. See, e.g., *Texaco, Inc. v. Fox*, 228 Kan. 589, 618 P.2d 844 (1980). Although the phrase "in paying quantities" may not appear in oil and gas leases, it implicitly is a part of the habendum clause. *Pray*, 233 Kan. at 353.

With regard to the "thereafter" provision, also known as the extension clause, of the habendum clause of an oil and gas lease,

the court noted that it is generally accepted the phrase "in paying quantities" means production of quantities of oil and gas sufficient to yield a profit to the lessee over operating expenses, even though the drilling costs or equipping costs are never recovered and even though the undertaking as a whole may thus result in a loss to the lessee. *Pray*, 233 Kan. at 355.

The court further stated that a shut-in royalty clause in an oil and gas lease enables a lessee, under appropriate circumstances, to keep a nonproducing lease in force by the payment of the shut-in royalty and that such a clause by agreement of the parties creates constructive production. As such, the clause becomes an integral part of the habendum clause. *Pray*, 233 Kan. at 353.

The shut-in royalty clause was developed to protect against automatic termination of a lease where a gas well was drilled and *no* market existed for that gas. The reason that the shut-in royalty clause has come into growing use goes back to the inherent physical nature of natural gas. Unlike oil, it cannot be produced and stored or transported in railroad cars or tank trucks. A lessee completing a gas well consequently often had a special and quite onerous problem in finding a market outlet for the gas production. This would, at times, result in losing a lease at the end of the primary term. *Vernon v. Union Oil Company of California*, 270 F.2d 441, 446 (5th Cir. 1959); *Pray*, 233 Kan. at 353.

The "shut-in" royalty clause applies to circumstances where "a well capable of producing a profit is drilled but for the time being *no* market exists." *Pray*, 233 Kan. at 356. There is a mutual interest between the lessor and lessee when no market for the gas exists. However, once a market for gas is secured, that mutual interest no longer exists because the lessor's interest is in securing royalty payments from production, while the lessee's interest is divided between receiving revenues and minimizing expenses associated with that production. Thus, the "shut-in" royalty clause serves the interests of both parties only in situations where no market exists for the gas. *Pray*, 233 Kan. at 354.

The fact a lease is held by payment of shut-in gas royalties does not excuse the lessee from its duty to diligently search for a market and to otherwise act as would a reasonable and prudent lessee under the same or similar circumstances. *Robbins v. Chevron U.S.A., Inc.*, 246 Kan. 125, Syl. ¶ 6, 785 P.2d 1010 (1990).

Although a shut-in royalty clause does not normally specify the shut-in gas well must be capable of producing in paying quantities, such a requirement is implied. As noted, a shut-in royalty clause is a savings clause allowing for constructive production. Such clauses provide that upon payment of the shut-in royalty it will be considered as if gas is being produced within the meaning of the habendum clause. In order to achieve the desired result, namely a profit, production, whether actual or constructive, must be in paying quantities.

To obtain the maximum profit from its use of gas, the lessee chose not to produce gas from the wells that required constant maintenance. Because, in this case, at the time of shut-in there was a limited market available to defendants-lessees for the gas producible from the six wells at issue, the shut-in royalty clauses could not be invoked to perpetuate the leases. Thus, the trial court erred in finding the shut-in royalty clauses were properly invoked.

When a mineral lease is terminated because of failure to produce, subsequent production from the land will not extend its term or revive rights which the parties fixed in the contract. *Wilson v. Holm*, 164 Kan. 229, Syl. ¶ 7, 188 P.2d 899 (1948). Thus, because the leases had terminated because they were not producing in paying quantities, the trial court erred in considering the productive ability of the wells subsequent to the shut-in period when determining whether the wells were producing or capable of producing in paying quantities when shut-in. The trial judge's determination that the wells were currently producing did not save the leases because they had already terminated.

Because of our holding that the existence of a limited market precluded invocation of the shut-in royalty provisions in this case, we do not reach plaintiffs' assertion that the wells were incapable of producing in paying quantities due to their mechanical problems.

#### CROSS-APPEAL

In reaching a decision on the merits, the trial court did not consider the defendants' affirmative defense of equitable estoppel.

Equitable estoppel is the effect of the voluntary conduct of a party that precludes that party, both at law and in equity, from

asserting rights against another who relies on such conduct. A party seeking to invoke equitable estoppel must show that the acts, representations, admissions, or silence of another party (when it had a duty to speak) induced the first party to believe certain facts existed. There must also be a showing the first party rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts. There can be no equitable estoppel if any essential element thereof is lacking or is not satisfactorily proved. Estoppel will not be deemed to arise from facts which are ambiguous and subject to more than one construction. *Gillespie v. Seymour*, 250 Kan. 123, 129-30, 823 P.2d 782 (1991); *Ram Co. v. Estate of Kobbeman*, 236 Kan. 751, 766, 696 P.2d 936 (1985).

Defendants claim they continued to pay the operating expenses on the wells because of plaintiffs' acceptance of the shut-in royalty payments. They claim their reliance on the acceptance was reasonable and that plaintiffs are now estopped from terminating the leases.

In light of our holding that the shut-in royalty clauses could not be invoked, the matter must be remanded for the trial court to determine whether plaintiffs should be equitably estopped from claiming termination of the leases at issue is required.

Affirmed in part, reversed in part, and remanded for a new trial on the limited issue of equitable estoppel.