(927 P.2d 967)
No. 74,530

TOSHIBA MASTER LEASE, LTD., *Appellant,* v. OTTAWA
UNIVERSITY, *Appellee.*

Opinion filed
November 27, 1996.

*Gary V. Fulghum,* of Rose, Brouillette & Shapiro, P.C., of Kansas City, Missouri, for appellant.

Robert L. Bezek, Jr., of Bezek, Lowry & Hendrix, P.A., of Ottawa, for appellee.

Before ELLIOTT, P.J., KNUDSON, J., and RICHARD M. SMITH, District Judge, assigned.

KNUDSON, J.: This is a breach of contract action brought by Toshiba Master Lease, Ltd., (Toshiba) against Ottawa University (Ottawa) to collect lease payments under a written lease entered into between the parties for copier equipment. The litigation proceeded to a bench trial, with the district court concluding that Toshiba was equitably estopped from enforcement of the agreement. Toshiba has filed this appeal, contending that the district court improperly applied the doctrine of equitable estoppel. We affirm the judgment of the district court.

Toshiba finances business transactions between suppliers and their customers. In this case, the supplier is John Pappert, who owned a company named Century Office Products, Inc. (COPI). Pappert had previously supplied copier equipment to Ottawa and was again its supplier in the underlying transaction. The three-sided transaction appeared to work as follows: Pappert was an independent vendor who secured customers for leases to be financed by Toshiba as the lessor.

From Toshiba's perspective, there are two legal documents executed by Toshiba as lessor and Ottawa as lessee that detail rights, obligations, and liabilities: (1) the equipment acceptance purchase authorization and (2) the lease agreement.

The equipment acceptance purchase authorization was executed by Ottawa on October 26, 1989. The authorization certified that the copier equipment had been delivered, and received and that Ottawa had accepted it. Ottawa also acknowledged that Toshiba would purchase the copier equipment from COPI. Ottawa further acknowledged that it selected COPI as its supplier and also selected the copier equipment Toshiba was to purchase. The authorization concluded by stating:

"LESSEE ACKNOWLEDGES THAT . . . THE SUPPLIER . . . [IS NOT] AN AGENT OR REPRESENTATIVE OF LESSOR, AND . . . [IS NOT] AUTHORIZED TO WAIVE OR CHANGE ANY TERM, PROVISIONS, OR CON-

DITION OF THIS LEASE OR MAKE ANY REPRESENTATION OR WAR-
RANTY ABOUT THIS LEASE OR THE EQUIPMENT."

Ottawa signed the written lease agreement on October 26, 1989, and sent the document, along with the equipment acceptance purchase authorization, to Toshiba. On October 31, 1989, Toshiba executed the lease agreement. The lease agreement required 60 monthly payments of $1,594.54, contained explicit language that it was noncancellable, and iterated that the supplier had no authority to make any representations inconsistent with the terms of the written lease. The language used in both documents, which primarily protected Toshiba, is referred to in the leasing industry as "hell or high water" clauses.

In accordance with the documents, Toshiba believed that Pappert was providing Ottawa with new copiers. However, Pappert had previously supplied. Ottawa with the copiers under an older lease with another lessor. When Pappert solicited the Toshiba lease with Ottawa, he represented that the old lease would be paid off, and apparently it was. Just how that was accomplished is not clear from the evidence.

In February 1991, Pappert again negotiated a lease for copier equipment with Ottawa and secured financing through a company other than Toshiba. Under this new lease, Ottawa received one or two new copiers; the other four or five copiers were provided by Toshiba. Pappert again explained to Ottawa's representatives that the Toshiba lease would be paid off. Relying on Pappert's representations, Ottawa made its last payment to Toshiba in April 1991. Significantly, Toshiba quit sending monthly invoices to Ottawa. This was more than mere coincidence.

In the early part of 1991, Toshiba learned that Pappert had misrepresented to several lessees that their leases had been paid off. Toshiba chose not to notify its lessees; instead, Toshiba began negotiating with Pappert for payment of the leases. Ultimately, Pappert signed two promissory notes which obligated him and his company for the payment of the various lease obligations. In May 1991, Toshiba received a letter from Pappert's attorney stating that Ottawa's lease obligation should be included as an additional lease to

be paid by Pappert. Toshiba discontinued sending invoices to Ottawa, did not contact Ottawa and inform them of Pappert's fraudulent scheme, and continued to receive lease payments from Pappert under the promissory notes that initially distributed his payments to the various leases on a pro rata basis.

Pappert soon became delinquent in his payments to Toshiba. As a result of Pappert's nonpayments, Ottawa was invoiced in June and July 1991. When Ottawa's business manager received the June 1991 invoice, she telephoned Pappert, who assured her that it was a billing error and that he would take care of it. When Ottawa's business manager received the July 1991 invoice, she again telephoned Pappert; he told her to let Toshiba know that the lease had been paid. Subsequently, the business manager returned the July 1991 invoice to Toshiba with a handwritten note which stated that the lease had been paid off and that Toshiba should correct its records. Although Toshiba did not respond to the handwritten note, Ottawa received no further invoices.

Michael McGinley, the collections manager for Toshiba, testified that he could not say with certainty whether he received the returned July invoice with the note from Ottawa. However, McGinley indicated that the established practice and custom within the company would ensure that the note would reach his desk. McGinley testified that, in any event, he would not have contacted Ottawa upon receipt of the note since Pappert was making payments. McGinley confirmed that Toshiba never notified Ottawa that Pappert was making payments under promissory notes with the proceeds being applied to their lease.

In January 1992, Toshiba quit applying Pappert's note payments on a pro rata basis to the various leases and started applying them to an individual lease selected by Toshiba until that particular lease was paid off. Ultimately, Pappert defaulted and filed bankruptcy before Ottawa's lease was paid. Toshiba never at any time resumed sending invoices to Ottawa; however, in March 1994, Toshiba filed this lawsuit for the balance of the unpaid lease payments.

In granting judgment to Ottawa, the district court stated in its memorandum of decision:

"19. [Ottawa], in asserting equitable estoppel, must show that Toshiba, by its acts, representations, admissions, or silence when it had a duty to speak, induced [Ottawa] to believe certain facts existed that [Ottawa] rightfully relied and acted upon to its prejudice. *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 382, 855 P.2d 929 (1993).

"20. Actual fraud, bad faith, or an attempt to mislead or deceive on the part of Toshiba is not essential to a successful claim of equitable estoppel. *Potucek v. Potucek*, 11 Kan. App. 2d 254, 719 P.2d 14 (1986).

"21. The facts of this case are undisputed that [Ottawa] faithfully made the required monthly payments under the 1989 lease as it received invoices from Toshiba. When Mr. Pappert negotiated a new lease with [Ottawa] and represented to [Ottawa] that the 1989 lease had been satisfied and paid, the invoices from Toshiba to [Ottawa] stopped for three (3) or four (4) months until . . . an invoice generated by Toshiba requesting payments due in July and August, 1991, was received by [Ottawa].

"22. At this point, [Ottawa's] business manager, Marsha Denniston, wrote Michael McGinley, Toshiba's National Collections Manager, advising him that the 1989 lease had been paid off and asking him to correct his records.

"23. Mr. McGinley never responded and testified 'I didn't call her because (Toshiba) had agreed with Pappert that Pappert would pay off the [Ottawa] debt.'

"24. Toshiba was silent when it had a duty to speak. It had a duty to speak based on the written terms of its own invoices to [Ottawa] . . . . Those invoices invited [Ottawa], as Toshiba's customer, to contact Toshiba regarding the status of [Ottawa's] account. That is exactly what Marsha Denniston attempted to do. Further, all contracts imply an obligation of good faith in their performance or enforcement. . . .

"25. Because of Toshiba's silence and the manner in which it generated invoices to [Ottawa], Toshiba induced [Ottawa] to believe that in fact the 1989 lease had been satisfied and paid in full.

"26. [Ottawa] rightfully relied upon this belief and acted upon it to its prejudice.

"27. Toshiba argues that there was no prejudice to [Ottawa] because in negotiating the promissory note with John Pappert, Toshiba collected money to be applied to [Ottawa's] obligation. However, this Court finds that [Ottawa] was prejudiced because it was induced to take no action to protect its rights or pursue its own remedies against Mr. Pappert. Had [Ottawa] known of Pappert's fraudulent activity in July of 1991, when Marsha Denniston requested information from Toshiba, [Ottawa] could have pursued Pappert at a time when he had funds and assets to satisfy the [Ottawa] obligation in its entirety.

"28. Instead, [Ottawa] was induced by the silence of Toshiba and Toshiba's affirmative action in generating the invoices, to do nothing to protect its rights.

"29. [Ottawa] has met its burden of proving all of the essential elements of equitable estoppel.

"30. The defense of equitable estoppel is, in this case, a complete bar to plaintiff's claim."

On appeal, Toshiba contends that equitable estoppel is not applicable under the law and the evidence. Toshiba argues that it did not have a duty to advise Ottawa of its settlement agreements with Pappert, that Toshiba did not have actual or constructive notice that Ottawa thought the lease had been paid off, that Ottawa did not rightfully rely on the silence of Toshiba, and that Ottawa was not prejudiced by the conduct of Toshiba.

Our standard of review is as follows:

"Where the trial court has made findings of fact and conclusions of law, the function of an appellate court is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. Stated in another way, 'substantial evidence' is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion." *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 377, 855 P.2d 929 (1993).

## *The Duty To Speak*

Toshiba first contends that, as a matter of law, it had no duty to advise Ottawa of Toshiba's settlement agreements with Pappert. We find this contention to be without merit.

"Equitable estoppel is the effect of the voluntary conduct of a party whereby it is precluded, both at law and in equity, from asserting rights against another person relying on such conduct." *Gillespie v. Seymour*, 250 Kan. 123, 129, 823 P.2d 782 (1991). In *Tucker v. Hugoton Energy Corp.*, 253 Kan. at 383, the court stated:

"A party seeking to invoke equitable estoppel must show that the acts . . . or silence of another party (when it had a duty to speak) induced the first party to believe certain facts existed. There must also be a showing the first party rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts. There can be no equitable estoppel if any essential element thereof is lacking or is not satisfactorily proved. Estoppel will not be deemed to arise from facts which are ambiguous and subject to more than one construction. *Gillespie v. Seymour*, 250 Kan. 123, 129-30, 823

P.2d 782 (1991); *Ram Co. v. Estate of Kobbeman,* 236 Kan. 751, 766, 696 P.2d 936 (1985)."

Toshiba contends that the "duty to speak" may only arise as a result of disparate bargaining power or expertise where parties are contracting or if there is an underlying fiduciary relationship. Toshiba cites as authority *Eckholt v. American Business Information, Inc.,* 873 F. Supp. 510 (D. Kan. 1994), and *Flight Concepts Ltd. Partnership v. Boeing Co.,* 38 F.3d 1152 (10th Cir. 1994). Toshiba's contention is without merit. *Eckholt* and *Flight Concepts* both address fraud by silence, not equitable estoppel. More importantly, the cases do not support the conclusion advocated by Toshiba.

Kansas law is very clear—equitable estoppel does not arise out of contract but is based upon concepts of morality and justice. "Each case where the doctrine is raised as a defense must depend on its own facts." *Gas Service Co. v. Consolidated Gas Utilities Corp.,* 145 Kan. 423, 436, 65 P.2d 584 (1937).

Other jurisdictions also have concluded that equitable estoppel is not constrained by the law of contracts or the existence of a fiduciary relationship. See, *e.g., Seguin et al. v. Maloney-Chambers,* 198 Or. 272, 287, 253 P.2d 252, *reh. denied* 198 Or. 288 (1953), and *In re Ellison Associates,* 63 Bankr. 756 (S.D.N.Y. 1983).

Thus, the issue becomes whether Toshiba had a duty to speak under the evidence presented in this litigation. We believe that it did. Toshiba, Ottawa, and Pappert had a business relationship with one another that led to the written lease agreement for the copier equipment. The lease agreement gave rise to a duty of cooperation by the parties and implied good faith and fair dealing. See *Bonanza, Inc. v. McLean,* 242 Kan. 209, 222, 747 P.2d 792 (1987).

Toshiba entered into a side pocket agreement with Pappert for payment of tens of thousands of dollars which resulted from Pappert's scheme to defraud Ottawa and other Toshiba lessees. Then, without any explanation to Ottawa, Toshiba stopped sending monthly invoices for lease payments in response to Pappert's request that Toshiba not bill other Toshiba customers whom he was defrauding. Obviously, if Toshiba had continued billing Ottawa, Pappert's duplicity would have been unmasked. When Toshiba

temporarily resumed invoicing Ottawa in June and July 1991, the invoices again stopped after Pappert resumed payments. Also, at that time, Ottawa had returned an invoice with a handwritten note which reminded Toshiba that the lease had been paid off and that Toshiba's records should be corrected. Significantly, although Toshiba did not respond to Ottawa's note, it never invoiced Ottawa again.

Under the above circumstances, we believe that the trial court correctly determined that Toshiba breached a duty owed to Ottawa to speak and inform Ottawa (1) of Pappert's fraud, (2) of Toshiba's agreement with Pappert, and (3) of Toshiba's position that the lease had not been paid off.

### Actual or Constructive Notice

Toshiba next argues that the trial court erred in finding it received actual or constructive notice that Ottawa believed the lease had been paid off. Whether Toshiba received notice is a question of fact.

There is substantial competent evidence in the record to support the trial court's determination. Ottawa's business manager testified that her office mailed the invoice to Toshiba with the note advising that the lease had been paid. Moreover, Toshiba knew that Ottawa had been defrauded by Pappert and discontinued its billings to Ottawa after receiving the handwritten note that the lease had been paid off. Toshiba's contention is without merit.

### Ottawa's Reliance

Toshiba first argues that Ottawa was not receiving new copiers as provided in the lease agreement; therefore, Ottawa was not an innocent party. Toshiba's argument has no bearing on the issue before the court and nothing whatsoever to do with Toshiba's negotiations with Pappert and the circumstances that we have already noted.

Toshiba next argues that the "hell and high water" clauses in the written lease agreement and equipment acceptance purchase authorization should have put Ottawa on notice that the lease had not been paid. Certainly, this was an important circumstance, but

not one that we conclude would prohibit Ottawa from relying upon estoppel. The evidence at the trial revealed that Toshiba had allowed leases to be paid off. In fact, Toshiba's agreement with Pappert to conceal his fraud included acquiescence by Toshiba that the compromised leases would be paid off without the lessees ever being told by either of these parties what had occurred.

Toshiba also argues that the trial court's ruling is tantamount to permitting recision of the contract by Ottawa. We disagree. Ottawa has not sought to rescind its contract with Toshiba; rather, as was recognized by the trial court, Ottawa asked that Toshiba be estopped by its subsequent conduct from relying on an otherwise enforceable agreement.

We conclude that the trial court did not err in its determination that Ottawa reasonably relied upon Toshiba's silence.

### Whether Prejudice to Ottawa Has Been Shown

Toshiba argues that there is insufficient evidence to support the trial court's finding that Ottawa was prejudiced by its silence. Whether Ottawa was prejudiced is a question of fact.

The trial court found that if Toshiba had made appropriate and timely disclosures in the summer of 1991, Ottawa would have been able to protect its rights by taking action against Pappert while he was solvent. Toshiba argues that the trial court engaged in raw speculation that Ottawa would have protected its rights and pursued Pappert. In its written brief on appeal, Toshiba argues the "record is utterly devoid of any reference to [Pappert's] financial ability at any time to repay Ottawa or any evidence of any willingness to so pursue Pappert." We disagree. Contrary to Toshiba's contentions, the record contains more than sufficient evidence that Pappert was financially able to repay Ottawa. It is uncontested that Ottawa's obligation to Toshiba under the lease was $60,327.82. Additionally, the evidence shows that over the course of the next 3 years, during which Ottawa was unaware the lease had not been paid off, Pappert made sufficient payments to Toshiba to satisfy Ottawa's obligation. It is more probable than not that if Ottawa had been promptly and properly advised, Ottawa would have pursued recovery from Pappert.

In addition, the trial court was justified in using its common sense and making the reasonable inference that Ottawa would have pursued Pappert had Ottawa known (1) of Pappert's deceit, (2) of Toshiba's agreements with Pappert, and (3) of Toshiba's undeclared position that the lease was not paid off.

We conclude that there was sufficient evidence to support the trial court's finding of prejudice to Ottawa.

Affirmed.