NOT DESIGNATED FOR PUBLICATION

No. 126,339

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

N&B ENTERPRISES, INC.,
*Appellee*,

v.

WINONA C. ENGLISH; JACK G. AND
WINONA C. ENGLISH LIVING TRUST DATED
MARCH 2, 2000; and STACEY CAROL MURRELL,
*Appellants,*

v.

SONYA S. NOLAND and EDSEL E. NOLAND,
Trustees of the SONYA S. NOLAND LIVING TRUST
DATED MAY 25, 1999; LOIS J. BURRIS and
J.R. BURRIS, Trustees of the LOIS J. BURRIS
LIVING TRUST DATED APRIL 8, 1998; and
DEANNE K. BURRIS,
*Appellees.*

MEMORANDUM OPINION

Appeal from Allen District Court; DANIEL D. CREITZ, judge. Oral argument held July 9, 2024. Opinion filed January 24, 2025. Affirmed in part, reversed in part, and remanded with directions.

*Keith A. Brock*, of Anderson & Byrd, LLP, of Ottawa, for appellants.

*Robert E. Johnson, II*, of Johnson Schowengerdt, P.A., of Iola, for appellee, N&B Enterprises, Inc.

Before MALONE, P.J., HURST and COBLE, JJ.

1

HURST, J.: Decades ago, Winona English and her husband entered an oil and gas lease with N&B Enterprises, Inc. (N&B) in which they permitted N&B to run oil and gas operations on their land. In exchange, N&B was to pay the Englishes' royalty payments and allow them to use free gas for their primary dwelling. N&B now operates 4 "free-flowing" gas wells on the leased land as part of a gas field comprised of 22 other leases containing 82 additional wells. Over the decades, the relationship between N&B and English has deteriorated, and the volume of gas produced on the land—and thus Ms. English's royalties—have slowed to a trickle. After some disputes, English notified N&B that their oil and gas lease no longer produced gas in paying quantities and had terminated by its terms. N&B disagreed and pursued a breach of contract claim against English, claiming her 20-year use of free gas at a second residence on her property violated their lease agreement.

After a bench trial in which the district court excluded the testimony of English's expert witness, the court found that the English wells produced in "paying quantities" during the applicable accounting period and that English breached the lease by using free gas at a second residence on her property. On appeal, this court finds the district court erred in its paying quantities calculation and therefore reverses and remands for reconsideration. However, the district court's exclusion of testimony from English's expert witness and determination that English breached the lease are both affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

On August 21, 1997, English and her husband granted an oil and gas lease to N&B covering 240 acres of their property (the Lease). N&B operates the Lease as part of a larger gas field comprised of 23 leases with 86 gas wells. The gas from the natural gas field flows from the 86 wells through pipes to a single compressor station and, eventually, to a gas meter where it is delivered to the field's sole customer—the City of Iola, Kansas (the City).

2

The Lease states that it remains in force for one year "and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee." The Lease further provides that English receives "gas free of cost from any such well for all stoves and all inside lights in the principal dwelling house on said land during the same time by making [their] own connections with the well at [their] own risk and expense." Long before leasing the land to N&B, English had gas lines connected to her home and a second house on the property.

In September 2020, English notified N&B that the "lease has ceased producing either oil or gas in paying quantities and has expired by its own terms." About two weeks later, Mark Burris—the owner of N&B—filed an affidavit with the Register of Deeds for Allen County asserting the lease was "producing oil or gas in paying quantities" and, therefore, that "the lease remains in full force and effect . . . ." N&B eventually filed a lawsuit against English seeking, among other forms of relief, a declaratory judgment that the Lease remained in full force and effect. N&B further alleged English breached the Lease by using free gas for more than just the stove and lights in her principal house.

Before trial, N&B filed a motion to exclude the testimony of English's expert witness, Phillip S. Frick. Frick prepared a Lease examination report in which he concluded the Lease did "not produce in paying quantities" and therefore "expired on its own terms." Frick was also deposed prior to trial. N&B argued Frick was not qualified as an expert witness because "Frick's resume shows no knowledge of said natural free flowing gas wells nor of his ability to account for paying quantities." The district court conducted a hearing on the motion and ultimately took the matter under advisement.

In a pretrial order the district court initially denied N&B's motion to exclude Frick's testimony but cautioned English that she would have to establish a foundation for Frick's expert opinions at trial. The district court ultimately excluded Frick's expert testimony at trial, reasoning English failed to establish that Frick's testimony would be

3

the product of reliable principles and methods or that Frick had reliably applied the principles and methods to the facts of the case:

> "And the statute is 60-456. The parties have fully briefed it, and I don't think in—in (b)—first of all, I don't think (b)(1) is at issue. I think clearly Mr. Frick is very qualified. The issue is whether he's qualified to give an opinion on this type of well in this particular case. So I think his testimony would be based on sufficient facts and data—or data.
>
> "The problem here gets into the other two. At this point you've not established a foundation that his testimony or his opinion—expert opinion would be the product of reliable principles and methods for this particular type of well based on what he's testified to today and my recollection of the deposition. I have not reread the deposition today so—or prior to today; so I don't want to say I did. I read it before, but I haven't reread it today. But my recollection is it's fairly consistent with what he testified to in his deposition.
>
> "And then (b)(3): The witness has reliably applied the principles and methods to the facts of the case. We—we're not even close with that.
>
> "So I'm going to rule that the motion that I have—that on relevancy—the objection on relevancy that Mr. Johnson posed earlier in the testimony and that I took under advisement, I'm going to sustain that objection and I'm going to—on the basis I think it clearly violates—and I don't think we—and the Court has broad discretion. I get that. If I thought somehow this was going to aid the Court in its decision, I would be looking at it more closely; but I don't think it is. I think there is going to be one big legal issue that the Plaintiffs are going to have to hop over that we haven't even got to yet, but we'll deal with that later on.
>
> "But the issue here right now before the Court is this expert, and I'm going to find that Plaintiff's objections are sustained, that his testimony is not relevant in—under 60-456(b)(2) and (3), is inadmissible opinions. And I'm also going to find—and that—that will be the ruling of the Court."

The court admitted N&B's profit and loss statement into evidence for the applicable accounting period—which the parties agreed was from January 1, 2015, to December 31, 2019. The report showed that the Lease generated $7,567.78 in revenue

during the accounting period, $945.97 of which was paid to English as royalties. After deducting its identified expenses and the royalties paid to English, N&B claims it yielded $5,308.35 in profit for the Lease during the five-year accounting period.

At trial, Burris explained that N&B prorated its overall operating expenses among the various leases based on volume of sales for each lease:

"Q. How do you allocate expenses to the English lease?
"A. All of our leases are allocated based off of volume of sales.
"Q. So that's why I had you take a look at Exhibit 11. On Exhibit 11, for 2015, the English lease made .78 of 1 percent of your volume of sales?
"A. That's correct.
"Q. So then in 2015 on your schedules on Exhibit 14, are those expenses allocated based on that volume percentage?
"A. That is correct.
"Q. And is that how you allocate expenses on all of your leases?
"A. That is correct. All leases are calculated in the same manner.
"Q. Some leases are better than others?
"A. All leases are not created the same.
            . . . .
"Q. And has N & B consistently allocated expenses in this nature?
"A. Since the beginning of 1994."

Burris then explained that N&B believed allocating operating expenses by volume was fair and why it did not allocate its operating expenses based on the number of leases in the gas field:

"Q. Okay. Mr. Brock's client believes that you should allocate expenses based on a 1/23rd since there's 23 leases. Why—tell me why that's not practical.
"A. Well, as I made a comment earlier, there are no two leases alike. So when you look at this list of leases, they don't all have the same acreage, they don't have all the same well count, they don't have all the same—characteristics of the zone are not common

5

throughout the entire field. So, therefore, pressures and volumes and—and the amount—well, volumes that are still in the ground are different. Some of them may have some water that we deal with; some of them may not.

"So the reason that we allocate it by the percentage of volume and revenue is to be equally fair to every one of the leaseholders and more accurate to being able to compare that in that time an apple to an apple. You're actually comparing the apple of production to the apple of production. You're not saying that, oh, because you have five wells or you're 1/23rd and you may only—there may be some of these leases—I'm not sure—that may have only one well but produce at a different rate. So there's no fair way to do it.

"And we've been doing this since '94 with—the exact same way is we do it based off of volume of sales.

"Q. So if the Court were to adopt Ms. English's theory of 1/23rd per lease, in your opinion, as owner of N & B and a duty to your lessees, do you believe it would be prudent—as you as an operator on the Morlan lease in Exhibit 11 which makes 19.7 percent, would it be prudent of you as an operator to only charge them a little over 4 percent of the total expenses; or do you believe it's more prudent to charge the volume of sales?

"A. I believe it's more prudent to do it by volume.

"Q. And is that why you've made these sheets up and that's how you've done business?

"A. That is correct. That's—that's—that is the manner in which they adopted back in 1994 and it's the manner which they continue and we continue to produce to and pay royalties off of today."

In its memorandum decision, the district court found the Lease was producing in paying quantities and therefore did not terminate on its own terms and remained valid and in full force and effect. The district court also found that English breached the Lease because it only permits her to use free gas at her primary dwelling house, not the second house on her property. The court awarded nominal damages to N&B and ordered the gas line to the second home be disconnected.

English filed a motion to alter or amend the judgment or grant her a new trial in which she asked the district court to either "re-assess the evidence which presently exists in the record in the areas described herein and alter or amend the Decision based on the record as it presently exists" or "reconsider its decision to exclude the testimony of Phillip Frick and open the judgment to take additional testimony of such witness and amend the Decision accordingly pursuant to K.S.A. 60-259(a)(2)." The district court denied the motion, explaining that it reviewed the transcript and determined it "correctly excluded Frick's testimony." The district court reasoned that "Frick's experience was primarily in coal bed methane gas and oil leases, not free-flowing gas operations. Simply put, at trial the defendant failed to establish a foundation for the opinions under K.S.A. 60-456(b)(2)(3)."

English appealed.

## DISCUSSION

English claims the district court erred when it: (1) found the Lease produced in paying quantities, (2) excluded her expert witness' testimony, and (3) found that she breached the Lease by using free gas at more than one residence.

## I. THE DISTRICT COURT ERRED IN ITS PAYING QUANTITIES CALCULATION

When a district court makes factual findings and legal conclusions, as here, this court conducts a bifurcated review to determine whether the Lease produced in "paying quantities" during the accounting period. See *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 377, 855 P.2d 929 (1993) (applying the bifurcated standard of review to a "paying quantities" determination); *Clairborne v. Galemore*, No. 103,163, 2010 WL 5490736, at *5-6 (Kan. App. 2010) (unpublished decision) (when reviewing district court's conclusion as to whether a lease is producing in paying quantities, an appellate court

7

"must determine whether the district court's findings of fact are supported by substantial competent evidence and whether the findings are sufficient to support the court's conclusions of law"). First it must determine if the district court's decision is based on substantial competent evidence and then review the district court's legal conclusion de novo. *Pyle v. Gall*, 317 Kan. 499, 501, 531 P.3d 1189 (2023). This means any dispute concerning the district court's factual findings are reviewed to determine whether the challenged finding is supported by "such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion." *Bicknell v. Kansas Dept. of Revenue*, 315 Kan. 451, Syl. ¶ 10, 509 P.3d 1211 (2022). This court does not reweigh the evidence and "must accept as true the evidence and all the reasonable inferences drawn from the evidence which support the trial court's findings and must disregard any conflicting evidence or other inferences that might be drawn from it." *Gannon v. State*, 305 Kan. 850, Syl. ¶ 12, 390 P.3d 461 (2017). After determining the district court's factual findings are supported by substantial competent evidence, this court decides whether those facts are sufficient to support the district court's decision under the correct legal standard. *Pyle*, 317 Kan. at 501.

The Lease term only continues "as long thereafter as oil or gas, or either of them, is produced from said land by the lessee," which is a common habendum clause extending an oil and gas lease beyond its original term if the lease continues to produce. It is well settled in Kansas that this type of habendum clause, even when it does not contain such language, implicitly includes a requirement that the lease must produce "in paying quantities" for its term to continue beyond its original, fixed term. *Pray v. Premier Petroleum, Inc.*, 233 Kan. 351, 353, 662 P.2d 255 (1983); see *Reese Enterprises, Inc. v. Lawson*, 220 Kan. 300, Syl. ¶¶ 4-5, 553 P.2d 885 (1976). The purpose of this clause, in part, is to prevent lessees from holding unprofitable leases for speculation. See 220 Kan. at 313. The parties agree that the Lease must produce "in paying quantities" to remain in effect and avoid termination.

8

Production "in paying quantities" means "production of quantities of oil or gas sufficient to yield a profit to the lessee over operating expenses, even though the drilling costs, or equipping costs, are never recovered, and even though the undertaking as a whole may thus result in a loss to the lessee." *Reese*, 220 Kan. 300, Syl. ¶ 3. In determining whether an oil and gas lease is producing in paying quantities, the court must consider a "reasonable time depending upon the circumstances" to show the current production status and "provide the information which a prudent operator would take into account in whether to continue or to abandon the operation." *Texaco, Inc. v. Fox*, 228 Kan. 589, Syl. ¶ 3, 618 P.2d 844 (1980). In Kansas, the paying quantities calculation is "[a]n objective standard" which "turns upon a mathematical computation." *Reese*, 220 Kan. 300, Syl. ¶ 6. Therefore, in Kansas—unlike some other states—the paying-quantities calculation does not depend on the subjective belief of the lessee. 220 Kan. at 313-14 ("[T]he better approach is to follow the innumerable cases which apply an objective test, where the determination of 'paying quantities' turns upon a mathematical computation."). But see *T.W. Phillips Gas & Oil Co. v. Jedlicka*, 615 Pa. 199, 224-26, 42 A.3d 261 (2012) (finding paying quantities even when lease operated at a loss based on lessee's "good faith" belief).

The Kansas Supreme Court has explained that only "current costs of operations in producing and marketing the oil or gas" should be considered, not the initial costs of setting up or establishing the well. *Reese*, 220 Kan. at 314. This includes "[a]ll direct costs encountered, whether paid or accrued, in operating the lease as a prudent operator," which include:

- Labor
- Trucking
- Transportation expense
- Replacement and repair of equipment
- Taxes

9

- License and permit fees

- Operator's time on the lease

- Maintenance and repair of roads and gates

- Expenses for complying with state laws that require plugging abandoned wells and preventing pollution. 220 Kan. 300, Syl. ¶ 8.

The initial cost of drilling and equipment in setting up the well are not considered nor is depreciation on that original equipment. *Texaco,* 228 Kan. 589, Syl. ¶ 2.

The revenue used to calculate paying quantities includes "the lessee's share of production or his share of receipts from the sale of oil or gas is taken into account, and only the lessor's royalty or other share of production is excluded." *Reese*, 220 Kan. 300, Syl. ¶ 7. The parties agree on the revenue amount to be used in the "paying quantities" calculation, the proper accounting period for the calculation, and N&B's total expenses during the accounting period. The more difficult question in this case—and in most cases—is the type and amount of expenses to include in the calculation. The parties disagree on two points related to the operating expenses: (1) which of N&B's total expenses must be included in the "paying quantities" calculation and (2) the amount of those expenses attributable to the Lease.

N&B argues—without any legal authority—that because the Lease is a free-flowing gas well lease, the "paying quantities analysis applied in oil and coal-methane leases are inapplicable to the highly unique free-flowing gas leases in this case." However, the oft-cited Kansas standard for determining "paying quantities" has been applied to leases for natural gas wells. See, e.g., *Tucker*, 253 Kan. 373, Syl. ¶¶ 4-5; *Pray*, 233 Kan. at 353. While this court recognizes there are differences in the type and amount of expenses necessary to operate a typical oil well versus a free-flowing gas well—such as no need for artificial lift expenses or perimeter pressure adjustments—this court finds no reason the objective standard for calculating paying quantities cannot be applied in

10

this type of lease. An Ohio appellate court analyzing paying quantities for a free-flowing oil and gas lease made no distinction in its analysis relative to free-flowing leases and quoted a case involving an oil well when it defined paying quantities. *Fox v. Positron Energy Resources, Inc.*, 101 N.E.3d 1, 5 (Ohio Ct. App. 2017) (quoting *Blausey v. Stein*, 61 Ohio St. 2d 264, 265-66, 400 N.E.2d 408 [1980]). Moreover, the Kansas Supreme Court has discussed the type of expenses at issue in this case related to operating a natural gas lease. See, e.g., *Fawcett Trust v. Oil Producers Inc. of Kansas*, 315 Kan. 259, 262-65, 507 P.3d 1124 (2022).

The issue here is that N&B did not track its direct operating expenses for the Lease. Perhaps N&B is arguing the operation of free-flowing gas leases is such a unique circumstance that it cannot be expected to know or determine its expenses for individual leases. Once again, N&B provides no legal or logical support for that argument. N&B clearly maintains records of its expenses for operating the 23 leases within the gas field, including the English Lease. N&B's business decision to not maintain records of its operating expenses for individual leases is not supported by the well-established law that the court uses an operator's direct operating expenses to calculate paying quantities for oil and gas leases. See *Reese*, 220 Kan. 300, Syl. ¶ 8.

N&B also argues its operation of the 23 leases as some type of unit or group benefits both N&B and the landowner/lessors; this court finds it unnecessary to accept or refute that statement. There is no doubt that oil and gas lessees are required to prudently operate for the benefit of both the lessee and lessor, but that is not the issue here. See *Tucker*, 253 Kan. at 379 ("In the absence of a controlling stipulation, neither the lessor nor the lessee is the sole arbiter of the extent, or the diligence with which, the operations and development shall proceed. The standard by which both are bound is what an experienced operator of ordinary prudence would do under the same or similar circumstances, having due regard for the interests of both."); *Reese*, 220 Kan. at 314 ("[T]he lessee is held accountable for the production of the lease as a prudent operator

11

working for the common advantage of both the lessor and the lessee."). N&B's choice to not maintain accounting records to reflect its operating expenses specifically for the Lease does not change the legal standard for calculating paying quantities for the Lease. See *Wrestler v. Colt*, 7 Kan. App. 2d 553, 557-58, 644 P.2d 1342 (1982) (noting the expenses for each lease are required for "paying quantities" calculation). Because N&B only maintains its total operating expenses for the entire field—not the specific expenses for operating the Lease—this court must use the available evidence to determine N&B's expenses for operating the Lease. Neither the district court nor this court are obligated to accept N&B's contention that the only way to properly allocate the provided expenses is by volume of gas produced. See *Reese*, 220 Kan. at 313-14 (basing paying quantities calculation on objective mathematical calculation, not the lessee's good faith basis).

Before addressing the type and amount of expenses that must be included in the paying quantities calculation, it will benefit the analysis to set forth the parties' arguments. The table below shows the categories and amounts of expenses both parties argue should be included in the paying quantities calculation. N&B argues the included expenses should be prorated based on the Lease's volume of gas produced. English argues the "paying quantities" calculation must include more expenses than the ones identified by N&B and should be prorated by the total number of leases (23) in the gas field. The parties agree the total five-year revenue for the Lease was $7,567.78 and English's royalty payment was $945.97—so N&B's income from the Lease before expenses was $6,621.81. However, based on the different expenses included and their proration method, the parties disagree on the profit. N&B argues it yielded a profit of $5,308.35 while English claims the Lease suffered over an $18,000 loss.

| COST CATEGORY | | FIVE YEAR TOTAL | N&B PROPOSED ALLOCATION TO ENGLISH LEASE BASED ON VOLUME | AGREED OTHER ALLOCATION | ENGLISH PROPOSED ALLOCATION BASED ON NUMBER OF LEASES |
| --- | --- | --- | --- | --- | --- |
| Gas Meter on English Lease | | | | 181.20 | |
| General Liability Insurance | | 30,790.09 | 185.41 | | 1,338.69 |
| Licenses | | 277.50 | 42.51 | | *Unclear |
| Mineral Gas Tax | | 7,405.79 | 37.02 | | 321.99 |
| Personal Property Tax | | 3,4138.55 | | 867.32 (2.5%) | |
| Chemicals | | 63,926.08 | 0 | | 2,779.39 |
| Contract Labor | | 365,000.00 | 0 | | 15,869.57 |
| Gas Compressor | | 18,711.60 | 0 | | 813.55 |
| Repairs & Maintenance | | 84,569.00 | 0 | | 3,676.91 |
| N&B PROPOSED TOTAL COST | | | 264.94 | 1,048.52 | |
| ENGLISH PROPOSED TOTAL COST | | | | 1,048.52 | 24,800.10 *Not including Licenses costs |

The district court agreed with N&B regarding which expenses to include in its calculation but found the general liability insurance and licenses costs should be prorated based on the total number of leases on the field—not by the volume produced by each lease. Whether an expense constitutes an operating expense that must be included in calculating "paying quantities" is a question of law subject to de novo review. See *Reese*, 220 Kan. at 314 (explaining expenses to be included in determining "paying quantities"); *Texaco*, 228 Kan. at 594 (determining whether depreciation of equipment was a proper item of expense in determining profitability of the well). However, the amount of each of

those expenses to include in the calculation is a question of fact requiring this court to determine whether substantial competent evidence supports the district court's conclusion. See *Tucker*, 253 Kan. at 377. The first step is to determine which expense categories should be included in the paying quantities calculation.

A. The Expense Categories to Include in the Paying Quantities Calculation

English contends the district court erred in failing to include most of the expenses from N&B's profit and loss statement in its "paying quantities" calculation and specifically argues the following four expenses should have been included: (1) chemicals; (2) contract labor; (3) gas compressor; and (4) repairs and maintenance. N&B argues these categories are not direct operating expenses apparently because they did not occur "on this lease within the lease boundary" as Mr. Burris explained at trial. N&B provides no legal authority for its contention that operating expenses used to calculate "paying quantities" must occur on the leased premises. It also fails to support its argument that these specific costs are otherwise inapplicable to the "paying quantities" calculation in this case. In fact, these costs are frequently used to calculate "paying quantities."

Not only has the Kansas Supreme Court specifically identified two of these categories—labor and repairs/maintenance—as direct operating expenses for a "paying quantities" calculation, it also identified the "operator's time on the lease" as a separate operating expense. *Reese*, 220 Kan. 300, Syl. ¶ 8. Additionally, when the Arkansas Supreme Court identified costs used to calculate paying quantities, it listed the costs from *Reese* and also "chemical treating . . . and materials and supplies." *Ross Explorations, Inc. v. Freedom Energy, Inc*., 340 Ark. 74, 80, 8 S.W.3d 511 (2000). The Louisiana Court of Appeal explained that it considered whether an expense was "ordinary and recurring" rather than "extraordinary and largely non-recurring in nature" to identify the operating expenses used to calculate paying quantities. *Lege v. Lea Exploration Co., Inc.*, 631

14

So.2d 716, 719 (La. Ct. App. 1994). Additionally, according to the Internal Revenue Service Oil and Gas Audit Technique Guide, an industry operating expense

> "is commonly referred to as a 'Lease Operating Expense,' and includes the cost of operating and maintaining producing oil and gas leases. Such costs include labor for operating and maintaining the equipment on the lease, repairs and supplies, utilities, automobile and truck expenses, taxes, insurance, and overhead expenses such as bookkeeping, billing costs, and correspondence." See *Internal Revenue Service Oil and Gas Audit Technique Guide*, at 127 (revised on February 24, 2023).

N&B points to the lack of artificial lift or pumping costs required to get the gas to the surface as evidence that it has almost zero operating expenses for the Lease. The Oklahoma Supreme Court has used the phrase "lifting expenses" interchangeably with "operating expenses" when calculating paying quantities. See *Stewart v. Amerada Hess Corp.*, 604 P.2d 854, 857 (Okla. 1979). However, in *Stewart*, the Oklahoma Supreme Court explained that "lifting expenses may include: costs of operating the pumps, pumpers' salaries, costs of supervision, gross production taxes, royalties payable to the lessor, electricity, telephone, repairs and other incidental lifting expenses." 604 P.2d at 857 n.11. References to "lifting expenses" encompass far more than the actual mechanics of pumping the gas to the surface. See 604 P.2d at 857 n.11.

Similarly, N&B argues none of its costs associated with compressing the gas can be included in the "paying quantities" calculation. In making this argument, N&B seems to rely on a conclusion that its operating expenses stop at the wellhead, meaning only those costs associated with preparing the oil and gas before it hits the wellhead are included in the "paying quantities" calculation. See *Neuhart v. TransAtlantic Energy Corp.*, 121 N.E.3d 802, 810 (Ohio Ct. App. 2018) ("Gathering and compression costs are not directly related to the production of oil and gas. In fact, they become relevant only after oil and gas is produced."). However, this argument is inconsistent with Kansas law which imposes a "marketable condition" requirement on gas operators. See, e.g., *Fawcett*

15

*Trust*, 315 Kan. at 265 (finding the duty to market "requires the operator to prepare the gas for the market"); *Gilmore v. Superior Oil Co.*, 192 Kan. 388, Syl. ¶ 3, 392, 388 P.2d 602 (1964) (finding lessee was obligated to make gas marketable and therefore could not deduct from royalty payments the compressor cost that made gas marketable).

"Under Kansas law, all gas leases impose an implied duty on well operators to market any minerals produced," and "[a] corollary of the duty to market is the marketable condition rule, which requires well operators to make gas marketable at their own expense . . . ." *Fawcett Trust*, 315 Kan. 259, Syl. ¶ 2, 262. "If the gas is unmerchantable (i.e., unmarketable) in its natural form, the operator must pay all costs necessary to prepare the gas for the market at no expense to the royalty owners." *Fawcett Trust*, 315 Kan. at 265. Several other states that employ a "marketable condition" rule for royalty calculation have also disapproved the method of limiting the expenses attributable to the lessee based on whether they occur before or after the meter. See, e.g., *Garman v. Conoco, Inc.*, 886 P.2d 652, 660-61 (Colo. 1994); *Mittelstaedt v. Santa Fe Minerals, Inc.*, 954 P.2d 1203, 1208 (Okla. 1998); *Wellman v. Energy Resources, Inc.*, 210 W. Va. 200, 211, 557 S.E.2d 254 (2001).

According to the Lease, English's royalty payment is "one-eighth (1/8) of the gross proceeds at the prevailing market rate," which clearly includes a requirement that N&B receive the market rate for the gas. Moreover, whether the expenses for compressing the gas are called operating or marketing, they are included in the paying quantities calculation. In *Reese*, the Kansas Supreme Court explained that "[e]xpenses which are taken into account in determining 'paying quantities' include current cost of operations in producing *and marketing* the oil or gas." (Emphasis added.) 220 Kan. at 314. Therefore, if the labor, chemicals, gas compressor, and repairs or maintenance are either production costs or costs associated with making the gas marketable—meaning saleable at the market rate—they are included as expenses in calculating "paying quantities."

16

N&B's costs for labor, chemicals, and the gas compressor over the five-year accounting period were remarkably consistent. The gas compressor cost was between about $3,000 to $5,000 each year; the chemicals cost was between $9,000 to about $14,000 each year; and the contract labor cost was between $72,000 to $74,000 each year. N&B also had between about $10,000 and $30,000 of repairs and maintenance each year—with one outlier year—but the minimum was about $10,000 each year. There is nothing extraordinary about these expenses. They occurred in roughly the same amount each year. Not only has the Kansas Supreme Court specifically identified most of these expenses as necessary in calculating "paying quantities," they are all necessary to produce marketable gas from the Lease as further explained below.

N&B's costs for contract labor, chemicals, gas compressor, and repairs/maintenance on its profit and loss statement must be included to calculate paying quantities for the Lease. See *Reese*, 220 Kan. 300, Syl. ¶ 8.

B. Calculating the Amount of Expenses Attributable to the English Lease

The district court did not include the labor, chemicals, gas compressor, or repair/maintenance expenses to calculate paying quantities for the Lease, and its reasoning is unclear. The court either determined those categories were not the type to be included—which was a legal error as explained above—or it determined that N&B spent zero dollars in each of these categories for the Lease over the five-year accounting period. That is, the court might have determined that the total expenses in each of those categories was somehow attributable to the 22 other free-flowing leases in the gas field but not to the English Lease. This is a question of fact, requiring this court to determine whether there is substantial competent evidence in the record to support the district court's finding that N&B did not incur any of these costs for the Lease. See *Tucker*, 253 Kan. at 377.

17

Typically, this would be a relatively simple mathematical calculation based on the operator's records, but that is not the case here because N&B did not maintain a record of its individual expenses for the Lease. As the district court pointed out in its order, there is limited evidence explaining how to attribute N&B's total operating expenses to the Lease, making the district court's calculation exceedingly more difficult. The district court explained that "[a]ccording to the uncontroverted testimony of Burris, the labor costs for these 86 naturally flowing wells are, at most, nominal." It also explained that "[d]ue to the uniqueness of these wells, there is nominal or virtually no chemical expense and no transportation expenses. Here, there is insufficient evidence for the court to impute the additional expenses requested by English." The court then stated the wells operated in the gas field that include the English Lease "are clearly different" than typical stripper wells.

However, the district court's determination that none of N&B's expenses for the five-year accounting period for labor ($365,000), chemicals ($63,926.08), the gas compressor ($18,711.60), and the repairs and maintenance of equipment ($84,569) was attributable to the Lease is not supported by substantial competent evidence. Burris testified that N&B "run[s] a pretty tight ship," so the expenses identified in the profit and loss report—including the contract labor, chemicals, gas compressor, and repairs/maintenance—were all necessary "to operate as shown from 2015 to 2019." Regarding the chemical expenses, Burris testified the chemicals were required for dehydrating and adding "oils and treatments" to the natural gas to prepare it for sale to the City. He explained the City had specific requirements related to the condition of the gas and amount of condensation, and N&B used the chemicals to condition the gas for sale. The chemicals were necessary for all the gas from the field, including gas from the Lease.

Burris also testified that N&B operated a single compressor station for all 86 wells across the 23 leases, including the English wells, and it was necessary to compress all the gas before it could be sold to the City. Burris clarified that without creating differential pressure with the compression station, no gas would be removed from the

18

system. In fact, a lot of N&B's labor costs were also associated with the gas compressor. Burris testified the contract labor largely included his salary and that of their production manager, who "spends about 50 to 60 percent of his day . . . in the gas production." Of the time their production manager spent on gas production, "in the winter months, he spends 90 percent of his time at the compressor [station] as well as the City meter." It is uncontroverted that the gas compressor was necessary for N&B to sell natural gas, and without it (and thus its associated repair and labor costs), N&B could not sell gas from the field. N&B also uses the contract labor of Burris and their production manager to monitor for gas leaks, however minimal. Burris also testified that the repairs and maintenance identified in the profit and loss report were for repairs and replacement of equipment. He explained that each of the 86 wells had the same type of wellhead hookup and that, other than some difference in type of meter, the infrastructure and equipment for each well was the same. Burris also noted during his testimony that he operated equipment for N&B. There was no evidence that this equipment repair was wholly unrelated to the 86 wells in the gas field, including the 4 wells in the English Lease.

N&B argues that by combining its operations, English benefits in the amount she earns (less than $1,000 in royalties over the five-year accounting period) and the actual cost to operate her wells would be lower than what they attribute to it using the volume proration method. Therefore, because it could operate the Lease alone for even less, N&B contends that none of its chemical, labor, gas compressor, and repair/maintenance expenses should be attributed to the Lease. That is not the standard for calculating "paying quantities." The paying quantities calculation is mathematical—not aspirational based on perfectly lean operating conditions. See *Reese*, 220 Kan. 300, Syl. ¶ 6. The math is clear that N&B operates 86 free-flowing gas wells in a gas field comprised of 23 leases and that N&B incurs the operating expenses in its profit and loss report for those wells— including the English Lease wells. While it might be true that the uniqueness of free-flowing wells makes them less costly to operate than other gas wells, it is at best illogical and at worst disingenuous to conclude there are zero costs. It is undisputed that N&B

19

must operate the compressor and apply the chemicals to make the gas from the Lease marketable, and the labor and repairs and maintenance costs support that process. N&B's contention that it could reduce its expenses if it operated differently is irrelevant. As explained above, these costs relate to making the gas marketable, and thus some portion of N&B's contract labor, chemical, gas compressor, and repair/maintenance costs are attributable to the Lease.

N&B does not track its exact, direct expenses for each lease but rather combines its expenses attributable to the 23 leases in the gas field as a unit and then prorates them based on the volume of gas produced by each lease. This assumes that because the Lease produces a relatively small amount of gas, it incurs relatively small costs. N&B argues this methodology is fair because it compares "apples to apples"—that is, volume to volume—for each lease. However, the standard for calculating paying quantities is an objective mathematical calculation, not a fairness analysis. See *Reese*, 220 Kan. at 313-14; *Wrestler*, 7 Kan. App. 2d at 557-58 (finding the operator's proration method inapplicable). Therefore, the court must determine whether the volume proration method—or some other proration method—accurately reflects N&B's operating costs for the Lease. In *Wrestler*, the lessee arrived at its operating expense figures "by a proration of their total costs of operation for the entire" oil and gas field, and the court found that paying quantities must be calculated based on the individual lease at issue. 7 Kan. App. 2d at 559-60. Here, the district court disagreed with N&B's proration method for its general liability insurance and license fees expenses and prorated them by lease to more accurately reflect the actual costs incurred for the Lease.

The district court also noted that N&B's expense-tracking methodology and volume proration was akin to a pooling arrangement, to which the parties had not agreed. "Unitization is a means of consolidating development of property overlying a mineral reservoir into a single production unit." *Akandas, Inc. v. Klippel*, 250 Kan. 458, Syl. ¶ 4, 827 P.2d 37 (1992); see *Parkin v. Kansas Corporation Comm'n*, 234 Kan. 994, Syl. ¶¶ 4,

20

6, 677 P.2d 991 (1984) ("Unit operation of oil and gas leases involves the consolidation or merger of one or more oil and gas leases and the designation of one or more of the parties as operator."); *Lario Oil & Gas Co. v. Kansas Corporation Comm'n*, 57 Kan. App. 2d 184, 185, 450 P.3d 353 (2019) ("Sometimes described as 'unit operation,' unitization means the joint operation of all or some part of a producing reservoir."). Whether an oil and gas lease is being operated under a unitization agreement is important in part because "[p]roduction from any part of a consolidated or pooled oil and gas unit perpetuates all leases within the unit, even as to unitized acreage, unless the leases provide to the contrary." *Akandas, Inc.,* 250 Kan. 458, Syl. ¶ 8. Here, however, the parties have not created a unitization agreement, and the perpetuation of the Lease turns on whether *it* is producing in paying quantities by itself, independent of and without subsidizing from the other 22 leases.

English argues the court should prorate N&B's expenses equally by lease, in part because the volume-based method would create a situation where the higher-producing leases' margins would offset the costs of the lower-producing leases. According to English, so long as N&B has one large profitable lease in the gas field, the lower-producing leases will always appear to be producing in "paying quantities." English's argument is not without merit. However, N&B contends the costs resulting from a per-lease proration method are much higher than its costs would be if it operated the Lease independently by tracking its exact costs. The problem with N&B's argument is that "paying quantities" is not calculated based on how inexpensively the lessee *could* operate but on its actual operating costs. Kansas employs an objective—not subjective—paying quantities analysis, so N&B's volume proration method holds no favor. *Reese*, 220 Kan. at 313-14. The district court is not bound by either proration method nor must the same proration method apply to each expense.

The "paying quantities" calculation might be more accurate if some expenses are prorated based on volume, some evenly across all leases, and others based on the number

21

of wells. Neither party argued for allocating these expenses by a lease's proportionate share of the number of gas wells on the field, but that allocation method may be more appropriate depending on the expense. See *Sullivan & Garnett v. James*, 308 S.W.2d 891, 893 (Tex. Civ. App. 1957) (upholding a jury's verdict that a lease did not produce in "paying quantities" when it allocated expenses per well, rather than by income as proposed by lessee). For example, when discussing labor costs, if N&B is required to inspect, check, or otherwise maintain the ground, pipe, or area surrounding a well, then allocating those labor costs by well might be more appropriate than another method when the 23 leases each cover a different number of wells and acreage. While N&B's volume-based proration method might make sense for its chemical costs that are added based on gas volume, that same rationale does not apply for every expense. Although the compressor might operate longer for higher gas volumes, its maintenance and repair does not necessarily correlate to volume. As most people have experienced, all equipment requires maintenance, regardless of its hours of operation, and even lightly used equipment (such as vehicles, for example) can develop costly mechanical issues. Even if N&B had a separate compressor for the Lease, no matter how small, it would also need repairs and maintenance. Therefore, a per-lease or per-well proration method might make more sense for that expense. The goal is to determine N&B's actual costs for the Lease as it operated during the accounting period.

To the extent the district court determined that N&B's contract labor, gas compressor, repairs/maintenance, and chemical costs were not the type of expenses included in calculating paying quantities, that was an error. To the extent the district court determined that none of N&B's costs for contract labor, gas compressor, repairs/maintenance, and chemicals during the five-year accounting period were attributable to the Lease, that finding was not supported by substantial competent evidence. The district court's paying quantities determination is therefore reversed and remanded. On remand, the district court must determine N&B's direct costs for operating the Lease using the method that best fits the attributes of each expense. The district

22

court's inquiry is not limited by N&B's assertion of the type or amount of expenses to be included. See *Reese*, 220 Kan. at 314 (paying quantities calculation is objective); see also *State v. Martin*, 318 Kan. 538, 559, 544 P.3d 820 (2024) ("[W]e may consider a remand for additional fact-findings and legal conclusions if the district court's ruling is inadequate to disclose the controlling facts or basis for the court's findings."); *State v. Daino*, 312 Kan. 390, 397, 475 P.3d 354 (2020) ("The district court's legal error necessitates remand for additional proceedings and fact-finding under the proper legal framework."); *State v. Garcia*, 295 Kan. 53, 64, 283 P.3d 165 (2012) (reversing district court's decision based on an erroneous understanding of the law and remanding for another hearing applying the correct legal standard).

As a final matter on this issue, English asserts that if she prevails, she "should be awarded her costs, expenses and attorney fees incurred in the underlying litigation and in this Appeal pursuant to K.S.A. 55-201 and K.S.A. 55-202." However, it is unnecessary to consider English's request for attorney fees at this time because this court is remanding the case to the district court for further findings. It is also noted that English has not filed a timely motion to recover appellate attorney fees under Supreme Court Rule 7.07(b)(2) (2024 Kan. S. Ct. R. at 52).

II.     ENGLISH VIOLATED THE LEASE BY USING GAS AT A SECOND RESIDENCE

The district court found that English violated the Lease by using free gas at more than one house. The Lease provides that English receive free gas at her dwelling, and according to English, the Lease does not prohibit her from also producing natural gas from her property for her own use. English argues that she "is the owner of the [well] which predated [N&B]'s lease and is lawfully entitled to produce natural gas therefrom for use in the [second home] as such non-exclusive use was not precluded by the terms of the subject oil and gas lease." English further contends that even if the Lease did not

23

permit her to use free gas at the second house, N&B's breach claim is barred by waiver, estoppel, laches, agreement, and easement.

This court exercises unlimited review over the interpretation and legal effect of contracts, and no deference is given to the district court's review. *Trear v. Chamberlain*, 308 Kan. 932, Syl. ¶ 1, 425 P.3d 297 (2018); *Peterson v. Ferrell*, 302 Kan. 99, Syl. ¶ 2, 349 P.3d 1269 (2015). "The primary rule for interpreting written contracts is to ascertain the parties' intent. If the contract terms are clear, the parties' intent is to be determined from the contract language without applying rules of construction." *Trear*, 308 Kan. 932, Syl. ¶ 2. When the language is clear, this court interprets the terms of a contract relying only on the four corners of the document—and the language is clear here. While English asserts an interesting argument, the Lease's language clearly limits her right to free gas only to her "principal dwelling house."

In the Lease's section granting N&B a right to operate and mine for oil and gas on the leased land, it provides that those rights are given "[i]n consideration" for N&B performing certain obligations including paying English a royalty fee. Among the other considerations is that English will "have gas free of cost from any such well for all stoves and all inside lights in the principal dwelling house on said land during the same time by making [their] own connections with the well at [their] own risk and expense." This is something that N&B agreed to give English—in addition to the royalty payment—in consideration for N&B's ability to mine the land for oil and gas. These terms, along with the other provisions granting N&B mining rights, clearly show the intent to limit English's ability to mine the land subject to the Lease. If the Lease's terms intended to permit English to produce any amount of oil and gas from the leased land for any purpose, the disputed provision would be unnecessary and have no purpose. If English was, as she argues, free to use the gas as she pleases, there would be no point in explicitly identifying one specific circumstance in which she is permitted to use the gas for free.

24

The clear, unambiguous language of the Lease limits English's use of the oil and gas on the leased premises.

In the section of her brief in which she asserts that N&B's breach-of-contract claim is equitably barred, English offers no legal authority and, instead, advises this court that "[a] more detailed legal analysis of these affirmative defenses is set forth" in a brief she filed in the district court. This argument is therefore waived or abandoned. See *State v. Bailey*, 313 Kan. 895, Syl., 491 P.3d 1256 (2021) ("A litigant waives or abandons an issue by not supporting an argument with pertinent authority or explaining why the argument is sound despite a lack of pertinent authority."). Litigants cannot incorporate arguments by reference to briefs filed in the district court. See *Enlow v. Sears, Roebuck & Co.*, 249 Kan. 732, 744, 822 P.2d 617 (1991) (reference to transcript, instructions without specifying error or citing legal authority violates Supreme Court Rule 6.02[a][5] [2024 Kan. S. Ct. R. at 36]; prevents review of merits).

III.    ENGLISH FAILED TO SHOW THAT THE DISTRICT COURT ABUSED ITS DISCRETION IN EXCLUDING FRICK'S EXPERT TESTIMONY

The district court has broad discretion whether to admit expert testimony. *Smart v. BNSF Railway Co.*, 52 Kan. App. 2d 486, 496, 369 P.3d 966 (2016); see K.S.A. 2023 Supp. 60-456(b). This court reviews the district court's decision to exclude expert testimony for an abuse of that discretion. *State v. Aguirre*, 313 Kan. 189, 195, 485 P.3d 576 (2021). A court abuses its discretion when its decision is based on an error of law or fact or when it is arbitrary, fanciful, or so unreasonable that no other court would adopt the same decision. 313 Kan. at 195. This court evaluates whether the district court properly performed its gatekeeper role regarding expert testimony:

"First, by use of the correct legal standard governing the admissibility of expert testimony; and second, by application of that standard in evaluating whether (a) an expert

is qualified to render an opinion and (b) the opinion is sufficiently relevant and reliable. The 'legal standard' aspect of the gatekeeper role considers whether court action was based on an error of law, while the 'application' aspect of the gatekeeper role considers whether the district court committed an error of fact or acted arbitrarily or unreasonably." 313 Kan. 189, Syl. ¶ 4.

Under K.S.A. 2023 Supp. 60-456(b), expert testimony is admissible under the following circumstances:

"If scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise if: (1) The testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has reliably applied the principles and methods to the facts of the case."

"""To the extent [an expert] witness is relying primarily on experience [rather than on scientific methodology], he or she "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."""" *Aguirre*, 313 Kan. at 197 (quoting *Smart*, 52 Kan. App. 2d at 495).

English does not argue that the district court committed an error of fact or law that resulted in an abuse of discretion. Therefore, this court interprets English's objections to the court's exclusion of Frick's testimony as an allegation that the court acted unreasonably. The district court determined that English failed to establish a foundation that Frick had the requisite experience to provide the expert opinions in his testimony.

The record demonstrates that while Frick had extensive experience in oil and gas leases generally, he had little to no experience in the type of natural, free-flowing gas wells at issue in this particular lease. In fact, the vast majority of his experience was in oil

26

leases and he had never calculated paying quantities on a free-flowing gas lease. Frick also testified that at two companies where he worked that had gas operations, he was not involved with accounting and did not have experience with the costs to operate those systems. The district court explained in its denial of English's motion to alter or amend the judgment or grant her a new trial that "Frick's experience was primarily in coal bed methane gas and oil leases, not free-flowing gas operations. Simply put, at trial the defendant failed to establish a foundation for the opinions under K.S.A. 60-456(b)(2)(3)."

While not every court would reach the same conclusion as the district court here, based on the testimony presented to the district court, this court cannot say that no reasonable person would have taken the same view. The district court did not abuse its discretion in excluding Frick's testimony because there was sufficient evidence presented in Frick's deposition and at trial upon which a reasonable juror could have concluded that Frick did not have the requisite experience to establish a sufficient basis for his opinion in this particular case. Moreover, an expert's testimony is admissible "[i]f scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," and because of the specific issues and arguments in this case—many of which the district court correctly concluded were questions of law—it was not unreasonable for the district court to conclude that Frick's experience would not help the trier of fact better understand the evidence or determine a fact in issue. See K.S.A. 2023 Supp. 60-456(b).

English has therefore failed to carry her burden to show the district court abused its discretion in excluding Frick's expert testimony. However, on remand the district court may determine that it would benefit from additional information from the parties in order to determine the appropriate allocation of the contract labor, chemicals, gas compressor, or repair/maintenance costs in light of this opinion.

CONCLUSION

The district court's "paying quantities" calculation is reversed and remanded with directions to include N&B's costs for contract labor, chemicals, gas compressor, and repairs/maintenance. On remand, the district court must determine N&B's costs for production and marketing of the gas produced on the Lease using the method that most accurately reflects its actual costs. The district court's exclusion of English's expert witness and its determination that English breached the Lease by using free gas at more than one house are both affirmed.

Affirmed in part, reversed in part, and remanded with directions.